UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PUGET SOUNDKEEPER ALLIANCE, a non-profit,<br><br>Plaintiff,<br><br>v.<br><br>TACOMA METALS INCORPORATED and ROBERT D. POLLOCK,<br><br>Defendants. | Case No. C07-5227RJB<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT POLLACK'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (Dkt. 31) and Defendant Pollack's Motion for Summary Judgment (Dkt. 32). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file herein.

I. PROCEDURAL BACKGROUND

On May 4, 2007, Plaintiff Puget Soundkeeper Alliance ("Plaintiff") filed a complaint claiming that Defendant Tacoma Metals Incorporated violated various provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387. ("Clean Water Act"). Dkt. 1.

On March 18, 2008, the Court granted Plaintiff leave to file its Third Amended Complaint. Dkt. 21. On March 20, 2008, Plaintiff filed its Third Amended Complaint adding Defendant Robert Pollock and alleging that Defendants also violated the Resource Conservation and Recovery Act 42 U.S.C. §§ 6921-

6939e.

On June 19, 2008, Plaintiff filed a Motion for Partial Summary Judgment. Dkt. 31. On July 7, 2007, Defendants responded. Dkt. 33. On July 11, 2008, Plaintiff replied and included a request to strike material that was submitted with Defendants; response. Dkt. 36. On July 18, 2008, Defendant filed a surreply responding to Plaintiff's request to strike. Dkt. 39.

On June 24, 2008, Defendant Robert Pollack filed a Motion for Summary Judgment. Dkt. 36. On July 14, 2008, Plaintiff responded. Dkt. 37. On July 18, 2008, Defendant Pollack replied. Dkt. 38.

## II. STATUTORY BACKGROUND

**A.  Clean Water Act**

Congress enacted the Federal Water Pollution Control Act Amendments of 1972, as amended 33 U.S.C. §§ 1251 *et seq.*, commonly known as the Clean Water Act. *See Solid Waste Agency of N. Cook County v. United States Army Corps. of Eng'rs*, 531 U.S. 159, 174-75 (2001) (Stevens, J., dissenting). Except as provided, the Clean Water Act prohibits the discharge "of any pollutant by any person" to the navigable waters of the United States. 33 U.S.C. §§ 1311, 1362(7).

"A cornerstone of the Clean Water Act is that the 'discharge of any pollutants' from a 'point source' into navigable waters of the United States is unlawful unless the discharge is made according to the terms of a [National Pollutant Discharge Elimination System] permit obtained from either the United States Environmental Protection Agency ("EPA") or from an authorized state agency." *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002); *see also* 33 U.S.C. § 1342. "In Washington State, the Department of Ecology … is authorized by the EPA to administer the Clean Water Act's [National Pollutant Discharge Elimination System] program." *Ass'n to Protect Hammersley*, 229 F.3d at 1010-11. "[N]othing in the [Clean Water] Act shall preclude States from adopting and enforcing limitations on the discharge of pollutants more stringent than those adopted under the [Clean Water] Act." *City of Milwaukee v. Ill.*, 451 U.S. 304, 327 (1981) (citing 35 U.S.C. § 1370). Under this authority, Washington has adopted a Water Pollution Control policy to "maintain the highest possible standard to insure the purity of all waters of the state…, and to that end [to] require the use of all known available and reasonable methods by industries to prevent and control the pollution of the waters of the state… ." RCW 90.48.010.

"The Clean Water Act explicitly allows private citizens to bring enforcement actions against any person alleged to be in violation of federal pollution control requirements." *Ass'n to Protect Hammersley*, 299 F.3d at 1012; *see also* 33 U.S.C. § 1365(a). Moreover, citizens may bring actions to enforce both the federally promulgated standards and any relevant state standards. *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995); *Cmty Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002). Liability for a violation of the Clean Water Act is strict, *i.e.*, there is no "de minimis" defense. *Sierra Club v. Union Oil of California*, 813 F.2d 1480, 1490-91 (9th Cir.1987), *vacated on other grounds by* 485 U.S. 931 (1988).

The citizen suit provisions of the Clean Water Act do not authorize suits for violations that are "wholly past," rather the violations must be "ongoing." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64-65 (1987). "[A] citizen plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Natural Res. Def. Council v. Southwest Marine, Inc.*, 236 F.3d 985, 998 (2000). Intermittent or sporadic violations do not cease to be "ongoing" until the date when there is no real likelihood of repetition. *Id*.

Finally, except as otherwise specifically provided in the Clean Water Act, the term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body. 33 U.S.C. § 1362(5). Under section 309(c)(6) of the Act, 33 U.S.C. § 1319(c)(6), which covers criminal enforcement actions initiated by the Environmental Protection Agency, "the term 'person' means, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer." 33 U.S.C. § 1319(c)(6).

**B.  Industrial Stormwater General Permit**

"Stormwater runoff is one of the most significant sources of water pollution in the nation" *Envtl. Def. Ctr., Inc. v. United States Envtl. Prot. Agency*, 344 F.3d 832, 840 (9th Cir. 2003). In 1987, Congress amended the Clean Water Act adding Section 402(p), 33 U.S.C. § 1342(p), which requires permits for stormwater discharges that are associated with industrial activities. *See Envtl. Def. Ctr.*, 344 F.3d at 841. On August 21, 2002, the Washington Department of Ecology issued the current Industrial Stormwater

General Permit. Dkt. 31-15 ("General Permit").

The General Permit requires all industrial facilities in Washington with specified SIC (standard industrial classification) codes that discharge stormwater either to surface waters or to a municipal storm sewer system to apply for permit coverage. General Permit, Condition S1(A). The General Permit also requires that "[a]ll facilities covered under [the General Permit] have a Stormwater Pollution Prevention Plan … specifically developed for their facility." *Id*., Condition S9 ("Prevention Plan"). "The [Prevention Plan] must be consistent with [the General Permit] requirements, fully implemented …, and updated as necessary to maintain compliance with [the General Permit] conditions." *Id*. "The [Prevention Plan] must include the [best management practices] necessary to provide all known, available, and reasonable methods of prevention, control, and treatment ("AKART")." *Id*. The General Permit defines the AKART standard as representing "the most current methodology that can be reasonably required for preventing, controlling, or abating the pollutants and controlling pollution associated with a discharge." *Id*., Appendix 2. The Prevention Plan must include a minimum set of best management practices that cover: 1) a pollution prevention team; 2) good housekeeping; 3) preventative maintenance; 4) a spill prevention and emergency cleanup plan; 5) employee training; and 6) inspections and recordkeeping. *Id*., Condition S9(B)(3)(a)(i)-(vi).

The General Permit requires that permittees collect a sample of their stormwater discharge once each quarter, analyze it for particular contaminates, and report the results to the Department of Ecology on a discharge monitoring report. *Id*., Condition S4. If the best management practices implemented at a facility are insufficient to meet threshold levels of contamination in the stormwater discharges, called "benchmarks" and "action levels," the General Permit requires that the permitee implement additional measures. *Id*., Condition S4(C). For example, for samples collected after December 21, 2004:

> If any two out of the four previous quarterly sampling results for a parameter are above the action levels identified below, the permittee shall proceed with a level two response. If any four quarterly samples for a particular parameter are above the action levels identified below, the permittee shall proceed with a level three response.
>
> Total Copper – 149 µg/L; Total Lead – 159 µg/L; Total Zinc – 372 µg/L; Petroleum Oil & Grease – 30 mg/L; Turbidity – 50 NTU; BOD5 – 60 mg/L; Ammonia – 38 mg/L; . . .

*Id*. (the parties refer to "µg/L" as parts per billion). If a "level two" response is warranted, then the permittee shall:

1)     promptly identify the potential sources of stormwater contamination that are causing or contributing to the presence of the benchmark parameter,

2)     investigate all available options of source control, operational control and stormwater treatment best management practices to reduce stormwater contaminate levels below permit benchmark values,

3)     implement additional source and operational best management practices identified as part of this investigation,

4)     prepare a level two source control report outlining actions taken, planned and any scheduled for implementing source and operational best management practices to reduce stormwater contaminate levels, and

5)     submit the level two source control report to [the Department of Ecology] within six months of initiating a level two response.

*Id*. at p.26.

In addition, the General Permit requires that facilities implement adequate ongoing housekeeping measures, including maintenance and cleanup of areas that may contaminate rainwater before it flows across and off of a facility. General Permit, Condition S9(B)(3)(a)(ii).

## III.  FACTS

Defendant operates a metals recycling business, described by Standard Industrial Classification (SIC) code 5093, located at 1754 Thorne Road in Tacoma, Washington (the "Facility"). Dkt. 31-16, Stormwater Pollution Prevention Plan, Tacoma Metals, Inc., ("Tacoma Metals' Prevention Plan") § 3. Although most of the material that Defendant recycles is of an industrial nature and arrives by large truck, some materials are brought by members of the public. *Id*. Defendant purchases, sorts, resizes by hand and with hydraulic shears, creates bales of recycled metal, and sells the various metals that are brought to the Facility. *Id*. § 3.4.

The metals stored at the Facility are often the remains of large industrial machinery and equipment that can potentially contain various pollutants on the exterior surface of the materials from prior uses. *Id*. § 4.1. For example, metals are often covered with deteriorated coatings containing pollutants, and the metal surfaces themselves are often a source of contamination due to their deteriorated state. *Id*. Plaintiff claims that Defendant also receives a large amount of "metal turnings" — discarded remnants from metal manufacturing processes, such as the manufacturing of airplanes. Dkt. 31 at 9. Plaintiff claims that some of these metal turnings are often contaminated with various coolants and lubricants used in the machining

processes, including water soluble cutting oils. *Id*.

Defendant's Prevention Plan Consultant, David Johnson, (*see* Tacoma Metal's Prevention Plan § 2) stated that Defendant discharges approximately 5 million gallons of stormwater per year. Deposition of David Johnson ("Johnson Dep."), Dkt. 31-4 at 6. Stormwater from the Facility is conveyed to the City of Tacoma's stormwater conveyance system, and then discharged to the Sitcum Waterway. *See* Dkt. 31-19, Receiving Water Info. and Decl. of Mixing Zone Form. Plaintiff claims, and Defendant does not dispute, that Sitcum Waterway is a tributary to Inner Commencement Bay. Dkt. 31 at 9. Plaintiff also claims, and Defendant does not dispute, that the Washington Department of Ecology has identified Inner Commencement Bay as a contaminated sediment site. Declaration of Richard Horner ("Horner Decl."), Dkt. 31-3, ¶ 18.

Because Defendant's stormwater empties into an identified body of water, the General Permit requires that Defendant monitor its stormwater discharges for total suspended solids. *Id*. Defendant must monitor the stormwater to evaluate whether its discharges may be causing or contributing to a violation of the sediment management standards. *Id*. Plaintiff claims that Defendant has repeatedly exceeded the General Permit's benchmark and action level. *Id*., Attachment C ("Stormwater Sampling Results for Tacoma Metals, Inc.").

## IV. DISCUSSION

**A.  Motion to Strike**

Defendant Tacoma Metals submitted a declaration of David T. Johnson in support of its response to Plaintiff's motion for summary judgment. Decl. of David T. Johnson, Dkt. 35 ("Johnson Decl."). Plaintiff claims that, in his declaration, Mr. Johnson advances expert opinions and that Defendant has never disclosed Mr. Johnson as an expert witness, nor has it disclose a report providing his opinions to be presented. Dkt. 36 at 2-4. Plaintiff argues Mr. Johnson's opinions should be stricken because he is an undisclosed expert. *Id*.

A party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. Fed. R. Civ. Pro. 26(a)(2)(A). A witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Fed. R. Evid. 702. Defendant essentially concedes that Mr. Johnson was not

disclosed as an expert and, therefore, he may not testify as an expert. *See* Dkt. 39 at 1.

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. Defendant argues that Mr. Johnson's opinions may be offered because the opinions are based on his "particularized knowledge accrued by virtue of his work for [Defendant] and elsewhere in the industry," which is different than Rule 702's "other specialized knowledge." Dkt. 39 at 3-4.

"Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. advisory committee's notes. "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.' " *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 549 (1992)).

Defendant claims that, since 2005, Mr. Johnson has been retained by Defendant "to assist it in developing and implementing a [Storm Water Pollution Prevention Plan] and [best management practices]." Dkt. 39 at 3. Mr. Johnson claims that he is "very familiar with the [Defendant's] operation, particularly facts and practices affecting stormwater and pertaining to compliance with the Clean Water Act." Johnson Decl. at 2-3. Plaintiff concedes that Mr. Johnson was identified as a witness and that Plaintiff was able to depose Mr. Johnson. Dkt. 36 at 3-4. Therefore, Mr. Johnson may submit evidence as a lay witness. The Court will not consider any evidence that Mr. Johnson offers that is "within the scope of Rule 702."

**B.  Summary Judgment**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – *e.g.*, a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.      Plaintiff's Summary Judgment Motion**

Plaintiff has moved for partial summary judgment requesting that the Court hold Tacoma Metals "liable for certain ongoing violations of the Clean Water Act." Dkt. 31. Plaintiff alleges Defendant is liable for the following ongoing violations: 1) failure to implement best management practices, *id*. at 10; 2) discharge of cutting oils, *id*. at 12; 3) failure to prepare and implement an adequate stormwater pollution prevention plan ("prevention plan"), *id*. at 14; 4) failure to provide a copy of that prevention plan, *id*. at 17; 5) failure to prepare a level two response, *id*. at 18; 6) failure to implement a level two response, *id*.; 7) failure to install stormwater treatment measures, *id*. at 19.; 8) failure to submit monitoring reports, *id*. at 21; and 9) failure to properly sign and certify documents, *id*. The Court will consider the alleged violations in this order consistent with and numerically referenced by the preceding list.

Plaintiff claims that Defendant has failed to respond to ongoing violations 8 and 9. Dkt. 36 at 6. Defendant not only has failed to respond but also has failed to identify evidence that would create a general

issue of material fact on these issues. *See* Dkt. 33. Therefore, the Court should grant Plaintiff's Motion for Summary Judgment for Defendant's ongoing violation number 8, failure to submit monitoring reports, and violation number 9, failure to properly sign and certify documents. The Court will address the merits of the remainder of the alleged violations.

### 1. First Alleged Violation – Best Management Practices

Plaintiff argues that the best management practices that Defendant has "implemented at the Facility do not meet Washington's AKART standard . . . ." Dkt. 31 at 10. Defendant responses that it implements both adequate source control best management practices and adequate housekeeping best management practices. Dkt. 33 at 3-5.

#### a. Source Control Practices

Plaintiff claims that Defendant "stores metals, including metals contaminated with industrial fluids, in uncovered dumpsters that are allowed to collect rainwater and brew it into a toxic soup that leaks out and is discharged into Commencement Bay." Dkt. 31 at 11. Plaintiff has submitted photographs of these uncovered dumpsters (Horner Decl., Attachment B) as well as an inspection report from the Department of Ecology that states the following:

> Observations indicate that [Defendant is] relying on the oil/water separator to treat general stormwater rather than using source control [best management practices] as required by the permit. Oil discharges were observed in several areas. Small metal shavings are stored in open dumpsters; oil was observed in the bottom of the dumpster, as well as the pavement outside the dumpster . . . Near the southeastern portion of the facility was a large open dumpster with a heavy accumulation of oil on the pavement beneath it . . .
> In another area of the facility a small open dumpster had been elevated onto two drums. A drip pan half-full with oil was below the dumpster and a large oil stain was present around the pan. The manager stated that the dumpster had been elevated when it leaked and the drip pan placed under it. However, the pan apparently overflowed during the recent rain event.

Dkt. 31-7 at 2. Plaintiff argues that Defendant's storage means are not best management practices that meet the AKART standards and, therefore, Defendant is violating the General Permit. Dkt. 31 at 11.

Defendant counters that Plaintiff's "blanket assertions are inaccurate." Dkt. 33 at 3. Defendant states that Mr. Johnson, the consulting engineer for Defendant, "attests that [Defendant] has implemented applicable [best management practices] to minimize and control pollution of stormwater . . . ." *Id*. Defendant argues that "[t]here is clearly a difference of opinion between [Plaintiff's expert] Mr. Horner and Mr. Johnson as to whether [Defendant] has implemented adequate source control [best management

practices]." *Id*. at 4. Defendant, however, is not entitled to Mr. Johnson's opinions because he was not disclosed as an expert. *See above*. Moreover, Mr. Johnson's statement that Defendant has implemented adequate procedures is a legal conclusion and does not create an issue of fact as to the specific evidence that has been submitted by Plaintiff.

The remaining issue is whether these violations are considered "ongoing." Plaintiff can show that violations are ongoing if it establishes that the "violations . . . continue on or after the date the complaint is filed . . . ." *Southwest Marine*, 236 F.3d at 998. Plaintiff filed the complaint on May 4, 2007. Dkt. 1. Plaintiff's expert, Mr. Horner, declares that he toured the Facility on October 19, 2007 and that his opinions are the result of his observations and photographs from that site visit. Horner Decl., ¶ 11. Plaintiff has shown that Defendant's violations are "ongoing" violations.

Therefore, the Court should grant Plaintiff's Motion for Summary Judgment that Defendant has not implemented adequate source control best management practices because the record discloses that there are no issues of material fact regarding this alleged violation.

### b. Housekeeping Practices

Plaintiff claims that Defendant has failed to "implement housekeeping [best management practices] that meet the AKART standard." Dkt. 36 at 7. At a minimum, a stormwater pollution prevention plan "will include a [best management practice] that defines ongoing maintenance and cleanup, as appropriate, of areas which may contribute to stormwater discharges." General Permit Condition S9(B)(3)(a)(ii) ("Good Housekeeping" provision). Moreover, the prevention plan "will include the schedule/frequency for completing each housekeeping task." *Id*. The plan must be "fully implemented as directed by [the General Permit] conditions . . . ." *Id*. Condition S9 Introduction.

Defendant's prevention plan states that:

> Unloading and loading activities of new incoming materials are conducted on a concrete paved surface in the receiving area. Handling of metals during unloading and movement can mechanically dislodge contamination present on the metal surfaces that then falls onto the receiving area surface. [Tacoma Metals] has a full-time person assigned to sweeping and cleaning of the surfaces of the receiving area as well as high-traffic areas around the [Facility] where the potential exists for dirt and sediment to be transported to unprotected storm drains by storm events. Employees are trained to maintain areas clean of dirt. Catch basin inserts are regularly inspected and cleaned to prevent accumulated material from being washed into the stormwater piping system. Catchbasin sumps will be cleaned when the depth of sediment in the catch basin sump is greater than 1 inch of material. The stormwater piping system on the [Tacoma Metals] site is cleaned periodically to remove any accumulated material present in the piping system. The Vortechs treatment system is

inspected and cleaned when sediment accumulation depth has accumulated to within six
inches of the dry-weather water level.

Tacoma Metals' Prevention Plan § 5.1.2.

Defendant argues that its best management practices are both adequate and fully implemented. Defendant's president, Robert Pollock, "has testified in his declaration that [Defendant] has assigned to one employee the almost full time duty of sweeping the facility and cleaning any spills as soon as they are discovered." Dkt. 33 at 4. Mr. Johnson has declared that "[h]ousekeeping implementation consists of daily sweeping by an employee dedicated to that task as well as routine cleanup by employees employed in tasks which potentially create messy conditions." Johnson Decl. ¶ 15. Plaintiff argues that "[t]he Court should disregard these unsupported self-serving conclusory assertions that contradict [Defendant's] own compliance related documents." Dkt. 36 at 8. Plaintiff also argues that "[n]otably absent is any statement from [Defendant's] employee who supposedly performs the housekeeping measures." *Id*.

Plaintiff's expert, Mr. Horner, declares that "[a]s shown in photographs 6, 8, 11, 13, 14, 16, 18, 19, 20 and 22 in Attachment B, both fine and larger particulate matter are readily visible throughout the [F]acility, where they can be entrained by runoff and carried to [Commencement Bay]." Horner Decl., ¶ 21. Mr. Horner concludes that the existence of these metal particles are the result of "inadequate housekeeping practices . . . ." *Id*.

Based on the current record, there are questions of fact regarding both the issue of whether Defendant *implemented* housekeeping measures and, if so, whether Defendant's implementation was *adequate*. Therefore, the Court should deny Plaintiff's Motion for Summary Judgment that Defendant has not implemented adequate housekeeping measures.

### 2. Second Alleged Violation – Cutting Oils

Plaintiff claims that Defendant "stores metal turnings contaminated with water soluble cutting oils outdoors, where the cutting oil is allowed to drip off, enter storm drains, and contaminate stormwater." Dkt. 31 at 12 (citing Horner Decl. ¶ 24). In Mr. Johnson's deposition, he stated that "anything that allows the cutting oil to enter the storm drain would not be in compliance [with the Western Washington Stormwater Management Manual] . . . ." Johnson Dep. at 12. In his declaration, Mr. Johnson stated that "[t]here is no evidence that [Defendant] has failed to implement [best management practices] for covering

metal turnings but only that the [best management practices] have not always been successful." Johnson Decl. ¶ 24. This arguably could be considered an admission of numerous failures to "fully implement" the required best management practices. Regardless, Mr. Johnson is incorrect; Plaintiff has submitted substantial evidence of Defendant's failure to prevent cutting oil from entering storm drains.

Plaintiff claims that "for the purposes of this motion it is undisputed that these [cutting oil] violations occurred on at least five separate occasions. Dkt. 31 at 13; *see, e.g.,* Dkt. 31-10, *April 18, 2007 Ecology Inspection Report* ("Once again, metal cutting/turnings were stored there on the pavement and milky white cutting oil was dripping out of the bottom and flowing across the blacktop and into the drain."); Dkt. 31-11, *Sept. 6, 2007 Ecology Inspection Report* ("Water soluble cutting oils are still entering the storm drains."); Horner Decl. Attachment B, photographs 18, 20 and 22; Dkt. 31-13, *March 4, 2008 Ecology Inspection Report*, p. 2 (describing the "large stream" of cutting fluids observed flowing into storm drains on March 4, 2008); Dkt. 31-29, *Level One Response* (describing an inspection conducted on March 26, 2008 where "[c]utting oil residue was seen on the pavement in at least two locations…").

Although Defendant has attempted to create questions of fact regarding the adequacy of its prevention practices, Defendant has failed to submit admissible evidence that contradicts the consistent violations of leaking oils that were recorded in the ecological inspection reports referenced above. Therefore, the Court should grant Plaintiff's motion for summary judgment that Defendant has violated Condition S9 of the General Permit by allowing cutting oils to contaminate storm water.

**3.    Third Alleged Violation – Stormwater Pollution Prevention Plan**

All facilities covered under the General Permit must have a Stormwater Pollution Prevention Plan specifically designed for their facility that is consistent with the requirement of the General Permit and fully implemented. General Permit, Condition S9 Introduction. Moreover, the permittee must update the plan as required by the permit conditions. *Id*.

Plaintiff claims that Defendant is in violation of the General Permit "either for failing to have a [stormwater pollution prevention plan] in place at the time the Complaint was filed or for failing to maintain a copy of that [plan]." Dkt. 31 at 14. Mr. Pollock, however, has declared that "[f]or eight years, [Defendant] has maintained a copy of its [stormwater pollution prevention plan] onsite for inspection by the public." Pollock Decl. at 2. Defendant has established an issue of material fact regarding this issue.

Under a "demonstrative approach" to compliance, "[t]he technical basis for the selection of all stormwater [best management practices] must be documented within the Stromwater Pollution Prevention Plan." General Permit, Condition S9 Introduction. Alternatively, a permittee may follow a "presumptive approach" to compliance by choosing stormwater management practices contained in approved stormwater technical manuals. *Id*. Under the presumptive approach, the permittee must clearly state which of the approved manuals its best management practices are based on. *Id*. (A)(5). Although at the time the complaint was filed Defendant's stormwater pollution prevention plan did not cite an approved manual, Plaintiff concedes that Defendant has recently amended its plan by citing the Stormwater Management Manual for Western Washington ("Stormwater Manual"). Dkt. 31 at 15. Plaintiff, however, claims that Defendant has failed to update its best management practices in accordance with the Stormwater Manual. *Id*.

The record is not be fully developed on this issue. Plaintiff argues that Defendant's prevention plan dated June 21, 2007 does not contain sufficient best management practices. Dkt. 31 at 14-16; Dkt. 36 at 10-11. Defendant counters that it regularly updates its prevention plan as required. Dkt. 33 at 6. This creates a question of fact regarding the adequacy of Defendant's current prevention plan. Therefore, the Court should deny Plaintiff's motion for summary judgment on this issue.

### 4. Fourth Alleged Violation – Providing the Stormwater Pollution Prevention Plan

Upon receiving a request from the public for a copy of the stormwater pollution prevention plan, the permittee shall provide a copy, *or access to a copy*, of the plan as requested within a reasonable time frame. General Permit, Condition S5(F) (emphasis added). Plaintiff claims that it requested a copy of Defendants stormwater prevention plan on February 28, 2007 and that Defendant provided the plan on October 19, 2007. Dkt. 31 at 17-18. Plaintiff argues that this is a not within a "reasonable time" and is therefore a violation of the General Permit. *Id*. Plaintiff does not argue that it was refused access to Defendant's prevention plan.

Defendant is not under a duty to send a copy to the Plaintiff and may provide access to viewing the plan at Defendant's facility. *See* General Permit, Condition S5(F). Plaintiff's argument that a copy was not sent within a reasonable time is without merit. Therefore, the Court should deny Plaintiff's motion for summary judgment on this issue.

### 5. Fifth Alleged Violation – Level Two Response

If any two out of the four previous quarterly sampling results for copper are above 149 parts per billion, the permittee shall proceed with a Level Two Response. General Permit, Condition S4(C). Plaintiff claims that Defendant's stormwater contained more than 149 part per billion of copper in the fourth quarter of 2005 and the second quarter of 2006. Horner Decl., ¶ 17. Plaintiff argues that "upon receiving these results, [Defendant] was required to 'immediately' initiate a Level Two Response, and 'submit the level two source control report to [the Department of] Ecology within six months of initiating' the response – which was December 7, 2006." Dkt. 31 at 18.

Although Defendant did report to the Department of Ecology that its sampling results indicated that the level of copper exceeded 149 parts per billion, Defendant advances an "inconclusive results" defense. Dkt. 33 at 7. Defendant concedes that the laboratory reported a concentration of 150 parts per billion, but that measurement "only resolves to the nearest 10 parts per billion." *Id*. at 7-8. Defendant argues that:

> the detection only indicates that the concentration was greater than 145 parts per billion and less than 155 parts per billion. A reasonable interpretation of the result is that the concentration of copper in the sample was at the action level but not above it.

*Id*. Dkt. 31-36 at 1. "When a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error." *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1492 (9th Cir.1987) *vacated on other grounds by* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988). Moreover, the Ninth Circuit stated that "allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program." *Id*. While sampling error and inconclusive results may be technically different excuses, Defendant should not be allowed to impeach its own self-monitoring reports.

Therefore, the Court should grant Plaintiff's motion for summary judgment on the issue of Defendant's failure to timely submit its level two report to the Department of Ecology.

### 6. Sixth Alleged Violation – Implementing the Level Two Response

Plaintiff claims that Defendant has failed to implement the conditions of its Level Two Response that was submitted to the Department of Ecology. Dkt. 31 at 18. Defendant counters that it has "installed new catch basins, purchased new covered storage, implemented enhanced inspections of catch basins and

covered storage containers, additional focused housekeeping, and cleaned stormwater conveyance and treatment systems." Dkt. 33 at 8. Plaintiff argues that Defendant has failed to account for the following two conditions; 1) weekly inspections of the stormwater catch basins and 2) preparing checklists of such inspections. Dkt. 36 at 12-13. The determination of whether Defendant has either implemented every single provision of its Level Two Response or, if so, the adequacy of that implementation are an issues of fact for the factfinder. Therefore, the Court should deny Plaintiff's motion for summary judgment on this issue.

### 7. Seventh Alleged Violation – Level Three Treatment Best Management Practices

One of the requirements of a Level Three Response is that the permittee must "implement . . . stormwater treatment best management practices identified as part of this investigation within twelve months of initiating the level three response . . . ." General Permit, Condition S4(C). It is undisputed that Defendant was required initiate a level three response based on its sampling results. *See* Dkt. 31 at 19-21; Dkt. 33 at 8-9. Defendant, however, argues that it has submitted its stormwater treatment proposals to the Department of Ecology and is waiting for the department's confirmation. Dkt. 33 at 8-9. Defendant cites no authority for such an exemption from implementing the requirements of the General Permit. The General Permit plainly states that the stormwater treatment best management practices must be *implemented* within twelve months. Defendant has failed to implement these practices and is in violation of General Permit. Therefore, the Court should grant Plaintiff's motion for summary judgment on this issue.

## C. Defendant Robert Pollack's Motion for Summary Judgment

Defendant Pollack requests that the Court dismiss Plaintiff's "claims asserted against Pollock under the Clean Water Act . . ., on the grounds that there are no genuine issues as to any material fact and that Pollock is entitled to judgment as a matter of law." Dkt. 32 at 1-2. Defendant claims that the issue before the Court is "[w]hether Pollock can be found liable for the acts of a corporation in a citizen suit under the [Clean Water Act]." *Id.* at 3.

Defendant argues that there is a significant difference between the criminal provisions and the civil provisions of the Clean Water Act. *Id.* at 4-6. Except as otherwise specifically provided in the Clean Water Act, the term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body. 33 U.S.C. § 1362(5).

Under section 309(c)(6) of the Act, 33 U.S.C. § 1319(c)(6), which covers criminal enforcement actions initiated by the Environmental Protection Agency, "the term 'person' means, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer."  33 U.S.C. § 1319(c)(6). Based on this statutory framework, Defendant concludes that "while a corporate officer can be subject to penalties and other enforcement action [sic] brought by the government under the [Clean Water Act], a corporate officer is not subject to liability in a citizen lawsuit."  Dkt. 32 at 6.  Defendant implies that a responsible corporate officer is also exempt for individual acts.

The Court is unaware of any Ninth Circuit law addressing these provisions of the Clean Water Act. The Tenth Circuit, however, addressed the interpretation of these provisions in *United States v. Brittain*, 931 F.2d 1413, 1419 (10th Cir.1991).  In *Brittain*, the defendant had primary operational responsibility for the treatment plant, he physically observed the permit violations, he was informed by an employee that the violations were prone to occur, and he instructed employees not to make reports of the violations to the Environmental Protection Agency.  *Id*. at 1420.  Although *Brittain* involved the appeal of a criminal conviction, the court interpreted "the addition of 'responsible corporate officers' as an expansion of liability under the [Clean Water] Act rather than, as defendant would have it, an implicit limitation."  *Id*. at 1419. The court held that "that defendant, as an 'individual,' is a 'person' subject to criminal liability under the [Clean Water] Act."  *Id*.

In *United States v. Gulf Park Water Co., Inc.*, 972 F.Supp. 1056 (S.D.Miss. 1997), the Environmental Protection Agency brought a civil action under the Clean Water Act for civil penalties and injunctive relief.  *Id*. at 1058.  Plaintiff moved for summary judgment on the issue of individual liability.  *Id*. The court discussed individual liability in criminal and civil actions.  *Id*. at 1063-64.  Citing *Brittain* as well as "other cases construing federal environmental statutes," the court noted that "personal participation [was] the basis for individual liability."  *Id*.  One of the defendants, Michael Johnson, owned "100% of the stock in Gulf Park," was "an officer of Gulf Park," was Gulf Park's "on-site manager, who exercises day-to-day control over the operations of the facility," and had "been designated operator of the facility on permit applications . . . ."  *Id* at 1064.  The court held that, even though Michael Johnson was an officer of Gulf Park, he was "individually liable for violations of the [Clean Water Act]."  This Court agrees with and adopts this interpretation of "individual" under the citizen suit provisions of the Clean Water Act.

In this case, Defendant argues that "responsible corporate officers" can only be held liable for criminal violations of the Clean Water Act and not for civil penalties under the citizen suit provisions of the Act. Dkt. 32 at 4-6. Defendant's argument is unpersuasive. Defendant has failed to show that, under the civil enforcement provisions, the definition of "person" should be construed differently depending on whether the action is initiated by the government or a citizen. Moreover, Defendant has failed to show that a corporate officer cannot be held personally liable based upon the officer's involvement in the alleged violations. Therefore, Defendant is not entitled to summary judgment dismissing Plaintiff's claims against him based solely on the facts that he is a corporate officer of Tacoma Metals and that Plaintiff's alleged violations were the "acts of Tacoma Metals." (Dkt. 32 at 8).

As for his personal involvement, Defendant claims that "[t]he amended complaint contains no allegations that Mr. Pollock was personally in violation of (A) an effluent standard or limitation under [the Clean Water Act] or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." *Id*. at 3. Defendant is incorrect. Plaintiff's Third Amended complaint states that:

> Defendant Mr. Pollock is the president and sole or part owner of Tacoma Metals and is primarily responsible for the operations of Tacoma Metals, the facility and the violations complained of herein, has the ability to control the facility and the facility's compliance with its [National Pollutant Discharge Elimination System] Permit, the [Clean Water Act], and the [Resource Conservation and Recovery Act], and *has knowledge of and has observed the violations complained of herein*. Defendant Mr. Pollock has *aided and abided* in the violations complained of herein.

Dkt. 23, ¶ 15(emphasis added). Furthermore, Defendant Pollack is a listed member of the Tacoma Metals "Stormwater Pollution Prevention Team." Tacoma Metals' Prevention Plan § 2. As a member of that team, Defendant Pollock's responsibilities were the following:

> Ensure that stormwater management remains at a high priority. Monitors and oversees ongoing activities to implement stormwater contamination reduction measures. Devotes necessary resources to accomplishing stormwater pollution prevent activities.

*Id*. Plaintiff not only has alleged that Defendant Pollack was personally involved in the alleged violations but also has submitted evidence that Defendant was responsible for and personally involved in the stormwater management practices at the Tacoma Metals facility.

Therefore, Defendant has failed to show that he is entitled to summary judgment as a matter of law. Defendant has failed to show that he is protected from liability because he is a corporate officer and the violations were acts of the corporation. Defendant has also failed to show that he was not an individual

with significant responsibilities for the stormwater pollution prevention activities at the Facility.

Defendant requested that, if the Court denied his summary judgment motion, the Court should "make an order specifying the facts that appear without substantial controversy and directing such further proceedings in the action as are just." Dkt. 32 at 2. The Court, however, should deny Defendant's motion as a matter of law because Defendant, as the moving party, has failed to show that he is entitled to summary judgment. This is a different procedural posture than if the Court denied Defendant's summary judgment motion because Plaintiff has established material issues of fact regarding the legal question that was presented. Therefore, there is no reason to set forth what issues of fact remain regarding Defendant Pollack's liability.

## V. ORDER

Therefore, it is hereby

**ORDERED** that the Plaintiff's Motion for Partial Summary Judgment (Dkt. 31) is **GRANTED in part** and **DENIED in part** as follows:

(1) Defendant's failure to implement best management practices is **GRANTED in part** as to source control practices and **DENIED in part** as to housekeeping practices;

(2) Defendant's discharge of cutting oils is **GRANTED**;

(3) Defendant's failure to prepare and implement an adequate stormwater pollution prevention plan is **DENIED**;

(4) Defendant's failure to provide a copy of it stormwater pollution prevention plan is **DENIED**;

(5) Defendant's failure to prepare a level two response is **GRANTED**;

(6) Defendant's failure to implement a level two response is **DENIED**;

(7) Defendant's failure to install stormwater treatment measures is **GRANTED**;

(8) Defendant's failure to submit monitoring reports is **GRANTED**; and

(9) Defendant's failure to properly sign and certify documents is **GRANTED**.

Defendant Pollock's Motion for Summary Judgment (Dkt. 32) is **DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 5th of August, 2008.

*Robert J. Bryan*
ROBERT J. BRYAN
United States District Judge